UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
GEORGE M. BORRELLO, NEW YORK STATE SENATOR,
on his own behalf in his official capacity and on behalf of all
similarly situated members of the New York State Legislature,
CHRISTOPHER W. TAGUE, NEW YORK STATE
ASSEMBLY MEMBER, on his own behalf in his official
capacity and on behalf of all similarly situated members of          Index #:
the New York State Legislature,
MICHAEL LAWLER, NEW YORK STATE
ASSEMBLY MEMBER, on his own behalf in his official          **THIRD AMENDED**
capacity and on behalf of all similarly situated members of          **VERIFIED**
the New York State Legislature, and          **PETITION**
UNITING NYS, LLC

Petitioners,

For Judgment Pursuant to Article 78 of the CPLR

*-against-*

KATHLEEN C. HOCHUL, in her official capacity as
The Governor of the State of New York, MARY T.
BASSETT, in her official capacity as Commissioner of
Health for the State of New York, THE NEW YORK
STATE DEPARTMENT OF HEALTH, and THE
PUBLIC HEALTH AND HEALTH PLANNING
COUNCIL

Respondents.
-------------------------------------------------------------------------x

Petitioners, GEORGE M. BORRELLO, NEW YORK STATE SENATOR, on his own behalf in his

official capacity and on behalf of all similarly situated members of the New York State Legislature,

CHRISTOPHER W. TAGUE, NEW YORK STATE ASSEMBLY MEMBER, on his own behalf in

his official capacity and on behalf of all similarly situated members of the New York State

Legislature, MICHAEL LAWLER, NEW YORK STATE ASSEMBLY MEMBER, on his own

behalf in his official capacity and on behalf of all similarly situated members of the New York State

Legislature, and UNITING NYS, LLC, by and through their attorneys, Roberta (Bobbie) A. Flower

Cox, Esq., and Thomas Marcelle, Esq. by way of Petition for Declaratory Judgment and Preliminary and Permanent Injunctions against Respondents as named above, hereby allege as follows:

## NATURE OF ACTION

1. This is a hybrid proceeding on behalf of Petitioners and all those similarly situated, pursuant to New York Civil Practice Law and Rules ("CPLR") §78, §63 and §3001.

2. This Petition only raises New York State law claims. Petitioners are not seeking any relief nor are making any claim under either the United States Constitution or the laws of the United States. Any reference to the Constitution in the Petition refers to the New York State Constitution and references to constitutional rights in general or a particular right (for example but not limited to, substantive due process) refers to rights protected and guaranteed by the New York State Constitution.

3. Petitioners seek a preliminary and permanent injunction pursuant to CPLR §63 to stop Respondents' continued adoption and enforcement of 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, and a declaratory judgment pursuant to CPLR §3001 stating that:
   (a) Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, in violation of the NYS Constitution, and it is thus unconstitutional, ultra vires, and null and void.
   (b) Respondents lack statutory authority to promulgate 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, and it is thus unconstitutional, ultra vires, and null and void.
   (c) 10 NYCRR §2.13 *Isolation and Quarantine Procedures* violates Petitioners' substantive due process rights under the NYS Constitution, and it is thus unconstitutional, ultra vires, and null and void.

(d) 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is not the least restrictive way in which Respondents could try to achieve their goal, and thus lacks a rational basis and is arbitrary and capricious and as such is null, void and unenforceable.

(e) 10 NYCRR §2.13 *Isolation and Quarantine Procedures* violates existing New York State law, namely Public Health Law ("PHL") §2100 Titled "Communicable diseases; local boards of health and health officers; powers and duties", PHL §2120 Titled "Communicable diseases; control of dangerous and careless patients; commitment", PHL §12 Titled "Violations of health laws or regulations; penalties and injunctions", PHL §§2180-2182 Titled "Novel Coronavirus, Covid-19", and it is thus impermissible, null, void and unenforceable.

(f) that Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* in violation of the NYS Administrative Procedure Act ("SAPA") and as such it is null, void and unenforceable.

(g) Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, in violation of the Separation of Powers doctrine, and it is thus unconstitutional, ultra vires, and null and void.

(h) that Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* against the will of the NYS Legislature which refused to act on the topic, and as such is null, void and unenforceable.

(i) that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is invalid, null, void and unenforceable.

4. Petitioners seek a Preliminary and Permanent Injunction enjoining Respondents from implementing and enforcing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, the

basis for which is that 10 NYCRR §2.13 is causing immediate and irreparable harm to Petitioners and all those similarly situated.

5. Petitioners seek a Preliminary and Permanent Injunction enjoining Respondents from implementing and enforcing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, the basis for which is that 10 NYCRR §2.13 is capable of repetition yet evading review.

6. Petitioners seek a judgment annulling 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

7. Respondents, in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, have exceeded their executive powers, thereby harming Petitioners Legislators Senator Borrello, Assemblyman Tague, and Assemblyman Lawler by usurping the power of these Petitioners Legislators, and all New York State legislators similarly situated, by prohibiting them from performing their duties to represent their constituents and to make laws on behalf of the people of New York.

8. Respondents, in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, have exceeded their executive powers, thereby usurping the power of the NYS legislature whereby violating all Petitioners' constitutional rights to have a voice in the law-making process, and as such is causing ongoing harm to all Petitioners, and all those similarly situated.

9. Respondents, in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, have exceeded their executive powers, thereby misleading the public and causing ongoing harm to all Petitioners, and all those similarly situated.

10. Petitioners will continue to suffer irreparable harm in the absence of the equitable relief they now hereby seek.

11. Petitioners submit that the arguments they present herein, and supported by their Memorandum of Law, affidavits and exhibits, establish that Petitioners have a likelihood of success on the merits.

12. There are no questions of fact at issue in this case. There are only issues of law.

13. A balancing of the equities in this case favors the Petitioners.

14. For the reasons set for herein, and in all accompanying affidavits, exhibits, and Petitioners' Memorandum of Law, Petitioners respectfully request that this honorable Court grant Petitioners the relief sought.

## PARTIES

15. Petitioner George M. Borrello is a natural person, and a duly elected member of the New York State Senate who serves as the Senator for the 57th District of the State of New York which includes parts of/all of Allegany, Cattaraugus, Chautauqua, and Livingston Counties, and he is a resident of Chautauqua County.

16. Petitioner Christopher W. Tague is a natural person, and a duly elected member of the New York State Assembly who serves as the Assemblyman for the 102nd Assembly District of the State of New York which includes parts of/all of Greene, Schoharie, Columbia, Delaware, Albany, Otsego and Ulster Counties, and he is a resident of Schoharie County.

17. Petitioner Michael Lawler is a natural person, and a duly elected member of the New York State Assembly who serves as the Assemblyman for the 97th Assembly District of the State of New York which includes parts of Rockland County, and he is a resident of Rockland County.

18. Petitioner, Uniting NYS, LLC, is a domestic LLC organized and existing under the laws of the State of New York, with its principal office in Westchester County, and functions as a

citizens' rights advocacy organization dedicated to advancing and promoting the civil and legal rights of New Yorkers.

19. Uniting NYS has thousands of members throughout the State, and they are active advocates for the Constitutional rights of its members, and all those similarly situated.

20. Respondent Kathleen C. Hochul ("Governor") is the 57th governor of the State of New York. Her principal office is located at Office of the Governor of New York State, State Capitol Building, Albany, New York 12224.

21. Respondent Mary T. Bassett, M.D. ("Commissioner") is the Acting Commissioner of the Department of Health, with her principal office place located at Corning Tower, Empire State Plaza, Albany, New York 12237.

22. Respondent the New York State Department of Health ("DOH") is an agency which is part of the Executive Brach of the New York State government, with its principal office place located at Corning Tower, Empire State Plaza, Albany, New York 12237.

23. Respondent the Public Health and Health Planning Council ("Council") is an advisory council of the DOH with its principal office place located at Corning Tower, Empire State Plaza, Albany, New York 12237. The Public Health Law § 225 empowers the Council to advise the Commissioner of Health on issues related to the preservation and improvement of public health.

## JURISDICTION, FORM OF ACTION & VENUE

24. This Court has jurisdiction over this case in accordance with CPLR Article 78 (since Respondents are proceeding in excess of or without jurisdiction), CPLR § 3001 (to render a declaratory judgment regarding the unlawful enactment, implementation and enforcement of

an unconstitutional executive branch agency regulation, to wit: 10 NYCRR §2.13 *Isolation and Quarantine Procedures*), and the New York State Constitution Article 6 §7.

25. Venue is proper in Cattaraugus County pursuant to CPLR 506(b) as it is within the judicial district in which the material events giving rise to this petition have taken place.

## "REGULATION" AT ISSUE
### 10 NYCRR §2.13 *Isolation and Quarantine Procedures*

26. Petitioners allege this regulation is not a regulation at all, but instead, an impermissible law promulgated by Respondents.

27. A copy of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* can be found at https://regs.health.ny.gov/volume-title-10/content/section-213-isolation-and-quarantine-procedures and the full documentation with explanations is at Exhibit A.

28. The "Summary of Express Terms" section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* states that this "regulation" clarifies the authority and duty of Respondent DOH "to protect the public in the event of an outbreak of communicable disease, through appropriate public health orders issued to persons diagnosed with **or exposed to** a communicable disease." (Emphasis added). See Exhibit A.

29. This means Respondents can force isolation or quarantine on those who very well may not even have a communicable disease.

30. Without any statutory or other permissible authority, Respondents illegally promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* which, in summary:

    (1) endows Respondent Commissioner with the power to issue, or to direct a local health authority to issue, isolation and/or quarantine orders "to all such persons as the State Commissioner of Health shall determine appropriate." 10 NYCRR §2.13(a)(1)

(2) allows Respondent Commissioner Bassett to force people to isolate at home or in

"such other residential or temporary housing location that the public health authority

issuing the order determines appropriate..." 10 NYCRR §2.13(a)(4)

(3) specifies the details that each order must contain. In summary, this includes in

pertinent part:

> (a) basis for the order,
> (b) the location where the person is being forced to go/stay,
> (c) how long they will forcibly be held/isolated,
> (d) instructions on how to get to the quarantine facility location,
> (e) what other required actions the person must take while being forcibly held/isolated, subject to the Commissioner of Health's direction,
> (f) requirement to report to Respondents or local health authority their health status subject to the Commissioner of Health's direction,
> (g) requirement that they stay inside if they are quarantined/isolated in a multi-family dwelling, subject to the Commissioner of Health's direction,
> (h) requirement that they cannot come within 6 feet of another human being while forcibly held, subject to the Commissioner of Health's direction,
> (i) requirement that they must abide by any such other limitations on their interactions with other people as Respondent Commissioner deems appropriate,
> (j) notice that the person can request (request, not demand) that the government inform their family they are being forcibly held,
> (k) notice that the person can seek judicial review,
> (l) notice the person has a right to a lawyer.

(4) empowers Respondent Commissioner Bassett or other health authority to monitor the

person being forcibly held, coordinate with local law enforcement to ensure

compliance, etc. (See 10 NYCRR 2.13(c)(1-3)).

(5) empowers Respondent Commissioner Bassett or other health authority with the

power to prevent a property owner from entering their property if it is being used as

a quarantine facility location. 10 NYCRR § 2.13(d)

(6) empowers Respondent Commissioner Bassett or other health authority with the

power to decide what articles in a quarantine facility location can or cannot be

removed from the premises, and whether or not those articles are clean enough. 10 NYCRR § 2.13(e)

(7) establishes civil and criminal penalties if the citizen violates the Respondents' or other health authorities' order. Each day is a separate infraction. 10 NYCRR § 2.13(f)

(8) requires every doctor to not only report "a case **or suspected case**" (emphasis added) to Respondents and local health authority, but to enforce 10 NYCRR §2.13 by isolating the person from others immediately. 10 NYCRR § 2.13(g)

## BACKGROUND

### I. RESPONDENTS VIOLATED THE SEPARATION OF POWERS DOCTRINE: THE ABILITY TO MAKE LAW LIES WITH THE LEGISLATURE. THE LEGISLATURE DID NOT EMPOWER RESPONDENTS TO MAKE LAW; 10 NYCRR §2.13 IS AN IMPERMISSIBLE LAW

31. The Separation of Powers doctrine is the very foundation upon which our Nation is based. Each of our three branches of government exist to keep the other branches in check, they are co-equal branches, so as to maintain a balance of equal and fair governance of the people, by the people and for the people.

32. This iconic doctrine is codified in our New York State Constitution. Article III §1 clearly states, "The legislative power of this state shall be vested in the senate and assembly." There is no ambiguity there. Only the legislature can make laws. Article IV §1 clearly states, "The executive power shall be vested in the governor", so the governor enforces the policy decisions that come from the legislature.

33. This power to make law cannot be delegated to another branch of government. However, the legislature can bestow power on the executive branch to promulgate regulations to carry out laws passed by the legislature, as long as those rules carry out the legislative

intent of the anchor statute. (See detailed discussion in Petitioner's Memorandum of Law regarding *Boreali v. Axelrod*, 71 NY2d 1, 11 [1987], where the Court of Appeals struck down Respondent Council's regulation on smoking policies and restrictions).

34. Article V §3 of our New York State Constitution allows for the legislature to "assign **by law** new powers and functions to departments, officers, boards, commissions or executive offices of the governor, and increase, modify or diminish their powers and functions." (emphasis added). It is clear – the legislature must empower an agency or commissioner through the express dictate of a statute passed by the legislature.

35. In *GE Capital Corp. v. State Div. of Tax Appeals, 2 NY3d 249 [2004]*, the New York State Court of Appeals held that "the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation". (See detailed discussion in Petitioner's Memorandum of Law regarding applicable caselaw).

36. The Respondents have overstepped their domain, and their "regulation" is clearly not "filling in the interstices in the legislative product".

37. Respondents have crossed over into the legislative arena in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures* because they i) took the sum and substance of a failed Assembly bill (ie. Assemblyman Nick Perry's bill A416) which the NYS Legislature refused to act on for years, and Respondents made it into a "regulation", and ii) Respondents lack the emergency, special, temporary powers that the legislature bestowed upon former Governor Cuomo, and as such they are operating outside their authority, and iii) Respondents are making policy decisions in issuing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, in direct violation of the New York State

Constitution, applicable case law, and statutory law, and iv) Respondents violated the requisite provisions of the State Administrative Procedures Act ("SAPA").

### The Legislature Could Have Passed A Law Empowering Respondents To Issue Orders of Isolation and Quarantine If The Legislature Wanted: Assembly Bill A416 Was At Their Disposal, But The Legislature Chose Not To Act

38. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is clearly Respondents' way of circumventing the legislative process, and passing a law that the NYS Legislature refused to pass.

39. Assemblyman Nick Perry (D-Brooklyn) introduced bill A-416, entitled: *"AN ACT to amend the public health law, in relation to the removal of cases, contacts and carriers of communicable diseases who are potentially dangerous to the public health"*, which in its sum and substance is the same as 10 NYCRR §2.13 *Isolation and Quarantine Procedures*. (See Exhibit B).

40. Both bill A416 and 10 NYCRR §2.13 *Isolation and Quarantine Procedures* effectively allow Respondents, or their appointed delegees, to issue an order to force a person to be removed from society (by isolation, quarantine, detention), at the whim of Respondents, for however long Respondents deem appropriate, in a location determined by Respondents, because Respondents think the person *might* be a threat to public health since they were *possibly* exposed to a communicable disease, or *may* have the disease.

41. Assemblyman Perry has introduced bill A416 proposed legislation for several years since 2015 (bearing various Assembly bill numbers), including during the onset and the height of the COVID19 fear frenzy and pandemic.[1]

42. However, upon information and belief, the idea of forced isolation and quarantine

---

[1] https://www.nysenate.gov/legislation/bills/2021/a416

facilities was so repugnant to the legislators, that the bill failed to garner any support at all, time and again.

43. Upon information and belief, the legislature was not even interested in debating (let alone passing) bill A416, as the bill never had a sister bill introduced in the State Senate, and it was never even debated or brought to a vote.

44. Seeing as bill A416 had been failing for several years to gain any support whatsoever in either the Assembly or the Senate, Respondents took matters into their own hands, and adopted 10 NYCRR §2.13 *Isolation and Quarantine Procedures* as an emergency regulation, with the intent to make it permanent.[2]

45. In December 2021, Assemblyman Perry withdrew A416 from consideration, and the bill now shows status as "stricken". (See FN #1)

46. Respondents' quarantine and isolation regulation embodied in 10 NYCRR §2.13 *Isolation and Quarantine Procedures* effectuated a profound change in social policy, where unelected, agency bureaucrats can arbitrarily issue an order to a New Yorker forcing them to isolate or quarantine for an indefinite amount of time, at a location that the unelected, executive branch, employee gets to decide.

47. Only the legislature can make policy decisions, as per the New York State Constitution, the Separation of Powers doctrine, and applicable case law.

## Dozens of Legislators Have Been Vocal About Their Opposition To Respondents' Promulgation of 10 NYCRR §2.13 *Isolation and Quarantine Procedures*

48. On February 8, 2022, dozens of New York State Assembly members penned a letter to

---

[2] See State Register entry at p.14 https://dos.ny.gov/system/files/documents/2021/12/121521.pdf

Respondents Hochul and Bassett urging them and Respondent DOH to stop the adoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* "regulation". (See <u>Exhibit C</u>).

49. Their letter states in part:

> The decision to unilaterally declare these emergency regulations as permanent rules **circumvents the legislative process** that is enshrined in state law. Article III, Section 1 of the New York Constitution, states "[t]he legislative power of this state shall be vested in the Senate and Assembly". We believe that **the power to entrust the DOH and SED to permanently impose such mandates lies with the duly elected members of the state Assembly and Senate, not appointed commissioners.** (emphasis added)

50. The letter also states that the special powers the legislature endowed upon former Governor Cuomo at the beginning of the pandemic, have since expired, and as such Respondents lack the authority to issue directives such as 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

51. Their letter demands that Respondents abide by the Constitution and stop overstepping into the law-making realm of the legislature.

52. It reads in pertinent part:

> Regardless of one's opinion regarding the effectiveness of mask mandates, vaccine mandates, isolation or quarantine, **the people of this state deserve to have a voice in this discussion through their elected representatives.** Unfortunately, New Yorkers currently are in the dark as to what data the DOH and SED are relying on in making permanent these mandates, which greatly impact our school children, businesses and communities.
> We urge you to **reverse course and respect the authority of the state Legislature** and local governments as our Constitution intended.
> (emphasis added)

> ### Governor Cuomo Was Given Special, Temporary Powers That Allowed Him To Issue An Executive Order That Arguably Allowed For The Promulgation Of 10 NYCRR §2.13 *Isolation and Quarantine Procedures.* Respondent Governor Hochul Has No Such Powers

53. Prior to it being amended by the legislature in early March 2020, Executive Law 29-a allowed a governor, during a declared state emergency, the power to *suspend* provisions of

existing laws and rules as long as it was done subject to the State Constitution, the federal Constitution and federal statutes and regulations. (See Exhibit D).

54. On March 3, 2020, in response to the COVID19 outbreak that was unfolding, the legislature amended Executive Law 29-a thus expanding former Governor Cuomo's power to not only suspend laws but to also issue *"directives"* via Executive Order during a declared (by him) state disaster emergency for 30 days, which could be extended for an unlimited number of 30 day periods with consent of the legislature after each subsequent period.  (See Exhibit E).

55. On March 7, 2020, Governor Cuomo issued Executive Order No. 202 which essentially passed-on that law making power to the State agencies.  (See Exhibit F)

56. Executive Order No. 202 reads in pertinent part:

> ... by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to **temporarily suspend or modify** any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency... **I hereby temporarily suspend or modify**... the following:
> Section 224-b and subdivision 4 of **section 225 of the Public Health Law**, to the extent necessary to permit the **Commissioner of Health to promulgate emergency regulations** and to amend the State Sanitary Code;
> (Emphasis added).

57. The Commissioner of Health then adopted 10 NYCRR §2.13 *Isolation and Quarantine Procedures* as an emergency regulation on March 9, 2020.  (See Exhibit G).

58. Under Governor Cuomo, this "regulation" was readopted multiple times as an emergency regulation up until he repealed it by Executive Order No. 210.  (See discussion below).

59. After a year of Governor Cuomo issuing an unbelievable number of Executive Orders, in March 2021, the legislature amended Executive Law 29-a to repeal Governor Cuomo's authority (as well as any future governor) to issue Executive Orders during a state disaster emergency. (See Exhibit H).  Put more clearly, Governor Cuomo, and any/all successors thereto, now (as before March 2020) lack the power to issue "directives" (ie. make law).

60. Once former Governor Cuomo's *temporary* law-making power expired, so did the agencies' powers, and thus so did the "directives" or "regulations" that those agencies promulgated during that special time frame, including 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

61. There is no Executive Order that empowers Respondents DOH, Commissioner Bassett, and/or Council to enact or re-adopt 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, because Respondent Hochul lacks the power to issue any such Executive Order, because on March 5, 2021 the legislature extinguished the *temporary* law-making power it had given Governor Cuomo, when they again amended Executive Law 29-a and returned it to its original language that a governor can only suspend a law (not create a law) during a state emergency. (See Exhibit H).

62. Once Governor Cuomo declared the COVID state disaster emergency over on June 24, 2021,[3] that same day he also revoked Executive Order No. 202 by issuance of Executive Order No. 210. (See Exhibit I).

63. In so doing, former Governor Cuomo definitively ended the power he had bestowed upon the DOH and Commissioner which they relied upon to enact 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, and as such, 10 NYCRR §2.13 *Isolation and Quarantine Procedures* also became null and void and unenforceable.

64. Governor Cuomo resigned in early August 2021, and Respondent Kathy Hochul then automatically rose from Lieutenant Governor to Governor on August 24, 2021.

65. Respondent Hochul did not then, and does not now, possess the power to make or change laws through Executive Order during a state emergency.

---

[3] *See* "Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24," June 23, 2021 Press Release:  https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24

66. Executive Law 29-a remains the same since March 5, 2021. The legislature has not amended it since then, and they never gave Respondent Hochul the power to issue "directives".

67. Respondent Hochul cannot issue an Executive Order like Governor Cuomo did, and accordingly Respondents cannot rely upon an Executive Order for their authority to issue 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

68. Respondents took the exact same language that Governor Cuomo and his DOH/ Commissioner/Health Council ("administration") used in their 10 NYCRR §2.13 Emergency Regulation promulgation, and Respondents are simply repeatedly re-adopting that same "Cuomo version" of 10 NYCRR §2.13.

69. However, Respondents did not, and do not, have the power that Governor Cuomo and his administration did pursuant to amended Executive Law 29-a.

70. Respondents lack the power to promulgate their 10 NYCRR §2.13 "regulation" whether in emergency form or in permanent form.

71. And yet, Respondents' 10 NYCRR §2.13 "regulation" is the same exact language as Governor Cuomo's emergency 10 NYCRR §2.13 from March 2020!

72. Here is the timeline:

> (1) March 9, 2020, 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until June 6, 2020 (Cuomo administration) See Exhibit G;
>
> (2) June 5, 2020 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until September 2, 2020 (Cuomo administration) See Exhibit J;
>
> (3) September 3, 2020 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued

as an emergency regulation for 90 days until December 1, 2020 (Cuomo administration) See <u>Exhibit K</u>;

(4) December 2, 2020 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until March 1, 2021 (Cuomo administration) See <u>Exhibit L</u>;

(5) March 2, 2021 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until May 30, 2021 (Cuomo administration) See <u>Exhibit M</u>;

(6) May 28, 2021 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until August 25, 2021 (Cuomo administration) See <u>Exhibit N</u>;

(7) Original COVID state emergency ended June 24, 2021 and Cuomo repealed his Executive Order No. 202. (See <u>Exhibit I</u>).

(8) The legislature amended Executive Law 29-a on March 5, 2021 to revoke those special powers it gave Cuomo in March 2020. (See <u>Exhibit H</u>)

(9) August 26, 2021 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until November 23, 2021, (Hochul administration = illegal); (See <u>Exhibit O</u>).

(10) November 24, 2021 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 90 days until February 21, 2022 (Hochul administration = illegal). (See <u>Exhibit P</u>).

(11) February 22, 2022 10 NYCRR §2.13 *Isolation and Quarantine Procedures* issued as an emergency regulation for 60 days until April 22, 2022 (Hochul administration = illegal).  (See <u>Exhibit Q</u>).

73. Since there is no Executive Order for Respondents to try to rely upon, they are trying to use PHL §225 as their authority to promulgate 10 NYCRR §2.13 *Isolation and Quarantine Procedures.*

**Respondents Lack The Power To Promulgate 10 NYCRR §2.13** *Isolation and Quarantine Procedures* **Because Agencies Only Possess The Powers Given To Them By The Legislature Through Statute.  The Legislature Did Not Empower The Respondents To Promulgate 10 NYCRR §2.13** *Isolation and Quarantine Procedures*

74. The "Regulatory Impact statement" section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* says Respondents rely upon PHL §225 as the enabling statute, because they claim PHL §225 allows them to regulate "any matters affecting the security of life or health or the preservation and improvement of public health in the State of New York."[4]

75. As discussed in detail in Petitioners' Memorandum of Law, although this language in PHL §225 is broad, it does not support Respondents' reliance thereon, as courts including the United States Supreme Court have consistently held that they expect a legislative body to speak clearly when it intends to authorize an agency to do something that has great impact on the people. (See *National Federation of Independent Businesses, et al. v. Department of Labor,* 95 U. S. ___ (2022) quoting *Alabama Assn. of Realtors v. Department of Health and Human Servs.,* 594 U. S. ___, ___ (2021) (per curiam) (slip op., at 6) "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.")

76. Nowhere in PHL §225 does it allow Respondents to force New Yorkers into isolation or quarantine facilities without notice, or warning, for however long Respondents want,

---

[4] See https://www.nysenate.gov/legislation/laws/PBH/225   for full text of PHL §225.

simply because Respondents **think** a New Yorker **may** have been exposed to or **may** have a communicable disease. (*See* Footnote #4 for full text of PHL §225).

77. That is clearly something of vast significance to the people, and as such it is a policy decision for the people's elected representatives in the legislature to openly debate and vote upon (if they so choose). See Petitioner's Memorandum of Law for further legal discussion.

78. Respondents expanded their power well beyond what the enabling statute (PHL §225) intended, and in so doing, Respondents transgressed the line that separates administrative rule-making from legislating, and as such, exceeded their statutory powers.

79. In *Boreali v. Axelrod*, (71 NY2d 1, [1987]), the Court of Appeals held that when analyzing whether a state agency has over-stepped its bounds and entered into impermissible policy making, a court should center its analysis on the theme that it is the province of the people's elected representatives, not appointed administrators, that should resolve difficult social problems by making choices among competing interests.

80. The Court in *Boreali* laid out a four-pronged test to help make such a determination. See Petitioner's Memorandum of Law for the application of that four-pronged test to Petitioners' case at hand, which clearly shows that all four prongs of the *Boreali* test weigh heavily in favor of Petitioners.

81. The choice between depriving citizens of their right to live their lives freely without the fear of, or the actuality of, being forced to isolate or to be confined in a quarantine facility by the Respondents because the citizen may or may not have a communicable disease, versus the Respondents' interest in trying to possibly help keep people healthy, is clearly a difficult

social problem that must be handled by the legislature (if the legislature so chooses, which it has refused to take up thus far).

## Respondents Promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* As An Emergency Regulation In Violation of The State Administrative Procedure Act

82. Assuming arguendo that Respondents did possess the power to issue 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, they did so in violation of applicable law - the State Administrative Procedure Act ("SAPA") found at Chapter 82 of the Consolidated Laws of New York.

83. SAPA was enacted decades ago "[i]n order to provide the people with simple, uniform administrative procedures..." (SAPA §100).

84. The statute's legislative intent reads in part, "This act guarantees that the actions of administrative agencies conform with sound standards developed in this state and nation since their founding through constitutional, statutory and case law. It ensures that equitable practices will be provided to meet the public interest." (*Id*).

85. SAPA 202(6) allows for the implementation of an emergency regulation, when it is an emergency.

86. In direct violation of SAPA, Petitioners, since August 26, 2021, have been re-adopting 10 NYCRR §2.13 *Isolation and Quarantine Procedures* without there being any actual emergency. Here is how:

87. June 24, 2021, Governor Cuomo declared the COVID19 state disaster emergency over, and he issued Executive Order No. 210 which rescinded Executive Orders 202 through 202.111 and 205 through 205.3 whereby ending the transfer of his power to "issue directives" (ie. make law) to the State agencies.

88. Gone too was the ability to quarantine citizens (ie. 10 NYCRR §2.13 *Isolation and Quarantine Procedures*), as that was an emergency regulation that was issued by Respondents pursuant to a ***temporary* power** that was given to ***Governor Cuomo*** which he then ***temporarily* bestowed upon Respondents** DOH, Commissioner of Health, and resultingly, the Council.

89. The Cuomo administration issued its last emergency re-adoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* on May 28, 2021 which (impermissibly) went for 90 days until August 25, 2021.[5]

90. Respondent Hochul took office on August 24, 2021, and she issued Executive Order No. 1 that same day which extended all Executive Orders of prior governors until October 8, 2021. (See Exhibit R).

91. However, Governor Cuomo's state disaster emergency ended on June 24, 2021, and that same day he had issued Executive Order No. 210, which repealed all of his emergency power era Executive Orders, including Executive Order No. 202; so when Respondents DOH, Commissioner and Council re-adopted 10 NYCRR §2.13 *Isolation and Quarantine Procedures* as an emergency "regulation" on August 26, 2021, they did so without any justification, as there was no state disaster emergency at that time. (See Exhibit R). (See also Exhibit S at page 2 noting that Respondents admitted there was no state disaster emergency in August 2021).

92. That was a clear violation of SAPA §202(6) "*Notice of emergency adoption*" which requires there be an *emergency* that supports the circumventing of proper SAPA rule making procedures. (*See* §202(6)(d)(iv) which requires that Respondents provide the reason for the emergency promulgation).

---

[5] SAPA §202.6(b) clearly states that the readoption of an emergency regulation can only last 60 days.

93. Respondents' illegal August 24, 2021 re-adoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* had an (impermissible) expiration date of November 23, 2021. (*See* Footnote #5).

94. In direct violation of SAPA, again, on November 24, 2021, with no actual state of emergency, Respondents re-adopted 10 NYCRR §2.13 *Isolation and Quarantine Procedures* for another (impermissible) 90 days. (*See* Footnote #5).

95. On November 26, 2021, with not one case of the Omicron variant reported in New York, Respondent Hochul issued Executive Order No. 11 declaring a 30-day state disaster emergency because of a COVID19 variant that did not even exist anywhere in New York State. (See Exhibit T).

96. In this Executive Order, Respondent Hochul uses the same language as Governor Cuomo used in his Executive Order No. 202 that he issued once he received his extraordinary powers from the legislature.   (See Exhibit F).

97. Respondent Hochul's Executive Order No. 11 states in pertinent part:

> I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary **State agencies** to take appropriate action to assist local governments and individuals **in containing,** preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is **necessary to protect public health, welfare, and safety**. (Emphasis added)

98. The difference is that Respondent Hochul lacked the extraordinary power that Cuomo was given by the legislature during the pandemic, as discussed *supra*.

99. Respondents did not establish an actual factual basis for their self-proclaimed emergency, and yet Respondent Hochul has continuously issued States of Emergency so that she and her co-Respondents can continue to issue "emergency regulations", until they can make them permanent regulations.

100.     On December 26, 2021, Respondent Hochul issued Executive Order No. 11.1, which was an extension through January 25, 2022 of the provisions contained in her November 26, 2021 Executive Order No. 11.  (See Exhibit U).

101.     On January 15, 2022, Respondent Hochul issued Executive Order No. 11.2, which was an extension through February 14, 2022 of the provisions contained in her November 26, 2021 Executive Order No. 11, and 11.1.  (See Exhibit V).

102.   On February 14, 2022, Respondent Hochul issued Executive Order No. 11.3, which was an extension through March 16, 2022 of the provisions contained in her November 26, 2021 Executive Order No. 11, 11.1 and 11.2.  (See Exhibit W).

103.   On March 16, 2022, Respondent Hochul issued Executive Order No. 11.4, which is an extension through April 15, 2022 of the provisions contained in her November 26, 2021 Executive Order No. 11, and 11.1.  (See Exhibit X).

## Respondents Fail To Establish Any Actual Emergency

104.   In her Executive Order No. 11.3 issued February 14, 2022, Respondent Hochul gave a reason to extend the emergency declaration was because the rate of new COVID-related hospitalizations had been increasing over the past month.

105.   This is untrue, according to the Respondents' very own data prominently displayed on their website, which shows that new COVID-19 hospital admissions per 100,000 population had actually **declined** to 2.19 on February 12, 2022 from 8.87 on January 15, 2022.  And those numbers have been steadily dropping ever since.[6]

106.   Another reason Respondent Hochul provides in her February 14, 2022 Executive Order No. 11.3, as a reason to extend the emergency declaration was because "New York is

---

[6] https://coronavirus.health.ny.gov/daily-hospitalization-summary

experiencing COVID19 transmission at rates the State has not seen since April 2020."

107. But "transmission" of the virus is no longer a benchmark by which authorities are measuring the "pandemic" at this point in time. As of about February 25, 2022, the CDC changed its suggested metric for measuring the pandemic from just looking at number of positive cases to now focusing on also hospitalizations of those who are hospitalized actually due to COVID19.[7]

108. Even Respondents themselves have admitted there was no emergency when Respondents issued 10 NYCRR §2.13 *Isolation and Quarantine Procedures* the first time. On January 24, 2022, in *Demetriou v New York State Department Of Health*, 2022 NY Misc. Lexis 305, a case challenging the Respondents' mask mandate authorized by 10 NYCRR 2.60 *Face Coverings*, Supreme Court Justice Thomas Rademaker, SCJ, issued a Decision and Order, enjoining §2.60 *Face Coverings*, and granting a declaratory judgment striking down the mask mandate. (See Exhibit S). There, the trial Court held that §2.60 *Face Coverings*, was unconstitutional, a violation of separation of powers, and the Court struck it down and granted an injunction against Respondent State's enforcement of §2.60 *Face Coverings*, as it was causing irreparable harm. In his decision there, the Hon. Rademaker, SCJ, pointed out that Respondents admitted in their Answer that there was no public health emergency then caused by Covid-19. (*Id.* at p.2).

109. Moreover, on March 1, 2022, Respondents issued their "NEW REVISED Isolation & Quarantine Guidance" where the very first line says, "New York State continues to experience COVID-19 cases and hospitalizations, **but the numbers are decreasing**." (emphasis added) (See Exhibit Y).

---

[7] https://abcnews.go.com/Politics/cdc-ease-masking-recommendations-70-country-including-inside/story?id=83111596

110. Moreover, on March 15, 2022, the CDC revised its COVID19 death data due to a "coding error", and the number of supposed deaths due to COVID19 was slashed across all demographic categories; in children alone the CDC's numbers dropped 24%.[8]

111. There is no emergency justifying the Respondents' promulgation of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* emergency regulation.

112. Moreover, SAPA 202(6)(d)(iv) requires that a notice of emergency adoption:

> (iv) contain the findings required by paragraphs (a) and (c) of this subdivision and include a statement fully describing **the specific reasons** for such findings and the facts and circumstances on which such findings are based. Such statement shall include, at a minimum, a description of the nature and, if applicable, location of the public health, safety or general welfare need requiring adoption of the rule on an emergency basis; a description of the **cause, consequences, and expected duration of such need**; an explanation of why compliance with the requirements of subdivision one of this section would be contrary to the public interest; and an **explanation of why the current circumstance necessitates that the public and interested parties be given less than the minimum period for notice and comment** provided for in subdivision one of this section; (emphasis added)

113. Respondents' Emergency Justification section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* simply gives a general overview of COVID19 history on a world-wide and nation-wide level. The only relation to New York that Respondents provide is one sentence that broadly claims that the majority of positive cases (not hospitalizations or actually sick people, but positive tests) in New York over the preceding 30 days were from the Omicron variant. (See Exhibit A at p.31).

114. Respondents do not cite even one authority for this broad claim, yet it is their entire basis

---

[8] See https://covid.cdc.gov/covid-data-tracker/#demographics Footnote: "On March 15, 2022, data on deaths were adjusted after resolving a coding logic error. This resulted in decreased death counts across all demographic categories." (See also, https://www.westernjournal.com/cdc-makes-huge-change-pediatric-covid-data-used-media-scare-pieces-citing-coding-logic-error/?utm_source=Email&utm_medium=CTBreaking&utm_campaign=breaking&utm_content=conservative-tribune&ats_es=90467a4006c9287372c09bc47eccc501 )

for re-adopting 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, as an "emergency" (for the third time in a row).

115. Respondents want to act like it is still March of 2020 when the virus was new, fear permeated everyone's thoughts and actions, and there were no treatment protocols or testing capabilities.

116. It is clear that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* was promulgated without any substantive justification for the emergency adoption as required by SAPA §202(6)(d).

117. Respondents' failure to comply with SAPA procedures in and of itself renders 10 NYCRR §2.13 *Isolation and Quarantine Procedures* invalid pursuant to CPLR Article 78, in that it is in excess of the Respondents' agency jurisdiction, it is deemed arbitrary and capricious, and is therefore not valid, null, void and unenforceable.

## II. 10 NYCRR §2.13 *ISOLATION AND QUARANTINE PROCEDURES* IS IN DIRECT CONFLICT WITH STATE LAW – PHL §2100, PHL §2120, PHL §12, and PHL §§2180-2182, AND IS THEREFORE ARBITRARY, CAPRICIOUS AND IS PREEMPTED

118. It is well settled constitutional law that an agency regulation cannot change or contradict a law that has been duly enacted by the proper branch of government (ie. the legislature).

119. If state agencies (as a part of the Executive Branch) are permitted to make regulations in contradiction of valid, existing laws as passed by the legislature, then this would result in the abolition of the legislature as a co-equal branch of government.

120. Respondents Bassett, DOH and the Council have the authority to implement and apply rules concerning public health, but they cannot make law.

### 10 NYCRR §2.13 *Isolation and Quarantine Procedures* Directly Contravenes PHL §2100 Which is Entitled, "Communicable diseases; local boards of health and health officers; powers and duties", and is Thus Null and Void

121. 10 NYCRR §2.13(a)(1) empowers Respondent Commissioner to determine who she

thinks is appropriate to isolate/quarantine.   §2.13 (a)(1) states:

> (a) Duty to issue isolation and quarantine orders
> (1) Whenever appropriate to control the spread of a highly contagious communicable
> disease, the **State Commissioner of Health** may issue and/or may direct the local health authority to issue isolation and/or quarantine orders… to all such persons as the **State Commissioner of Health** shall determine appropriate. (Emphasis added).

122. This is in direct violation of PHL §2100 which clearly empowers "[e]very **local board of health** and every health officer" to guard against "the introduction of such communicable diseases as are designated in the sanitary code" (emphasis added). See Exhibit Z.

123. PHL §2100 does not empower the "State Commissioner of Health" to do anything – and as such, Respondent Commissioner Bassett cannot bestow that power on herself, and nor can any of the other Respondents.

### 10 NYCRR §2.13 *Isolation and Quarantine Procedures* Directly Contravenes PHL §2120 Which is Entitled, "Communicable diseases; control of dangerous and careless patients; commitment", and is Thus Null and Void

124. Public Health Law §2120 *Communicable diseases; control of dangerous and careless patients; commitment* clearly places the burden on the local government to prove it has the right to take a New Yorker's freedom away and force them to quarantine; but 10 NYCRR §2.13 *Isolation and Quarantine Procedures* improperly shifts that burden to the citizen to prove the government wrong. (See Exhibit AA).

125. This is akin to "guilty until proven innocent", and is the antithesis of what our legal system is based upon.

126. 10 NYCRR §2.13(a)(1) clearly gives unbridled power to the Commissioner to determine who should be isolated/quarantined, including people who may or may not actually be

infected, including people that have been *exposed to*, or have *possibly been exposed to* a communicable disease.

127. This is a direct contravening of PHL §2120(1) which only applies to individuals who actually have a communicable disease.

128. This is also a direct contravening of PHL §2120(1-3) which lays out a very clear process of what must happen before an individual is forcibly quarantined against their will: 1) an individual that **actually has** a communicable disease is identified by a doctor; 2) the doctor alerts a health officer; 3) if the infected person refuses to conduct themselves so as not to infect others, then the health officer investigates; 4) if the health officer investigates and determines the individual is a "menace to others", then the office applies **to a magistrate** for a court order of quarantine; 5) if after due notice and a hearing the magistrate determines that the complaint of the health officer is well founded and that the afflicted person is a source of danger to others, then 6) the magistrate may commit the person to any hospital or institution established for the care of persons suffering from any such communicable disease.[9]

129. 10 NYCRR §2.13(b)(11) states that "Any isolation or quarantine order shall specify… a statement that a person has the right to seek judicial review of the order…".

130. This is a direct contravening of PHL §2120(3) which requires the local health officer to obtain a **court order from a magistrate** *before* forcing a person into a quarantine and revoking their freedom.

**10 NYCRR §2.13 *Isolation and Quarantine Procedures* Directly Contravenes PHL §12 Which is Entitled "Violations of health laws or regulations; penalties and injunctions", and is Thus Null and Void**

---

[9] https://www.nysenate.gov/legislation/laws/PBH/2120

131. PHL §12 sets forth only two types of possible penalties for violating the health law or regulations: either through monetary fines (§12(1)), or through an injunction brought by the Attorney General at the Commissioner's behest (§12(5)). (See Exhibit BB).

132. PHL §12 says nothing about using local law enforcement, yet 10 NYCRR §2.13(c)(2) says Respondent Commissioner can "coordinate with local law enforcement to ensure that such person comply with the order."

133. 10 NYCRR §2.13 thus violates the statute by increasing the Commissioner's power to use law enforcement to enforce the "regulation".

134. PHL §12(1) says it applies to anyone who "violates, disobeys or disregards any term or provision of this chapter or of any **lawful** notice, order or **regulation** pursuant thereto...". (emphasis added).

135. Since 10 NYCRR §2.13 is not a lawful regulation, then enforcement pursuant to PHL §12 cannot be had.

### 10 NYCRR §2.13 *Isolation and Quarantine Procedures* Directly Contravenes PHL §§2180 – 2182 Which is Entitled, "Novel Coronavirus, Covid-19", and is Thus Null and Void

136. On January 1, 2021, the legislature passed Title 8 of the Public Health Law, entitled, "Novel Coronavirus, Covid-19" which is comprised of three sections: §2180 *Definitions*, §2181 *COVID-19 contact tracing; confidentiality,* and §2182 *Regulations.* (See Exhibit CC).

137. This statute is the only legislation that the legislature has passed that has anything to do with trying to contain the virus in any way, and the provisions speak **only** about contact tracing.

138. The legislature clearly intended to preempt the field of how to contain COVID19, including the possibility of forced quarantine/isolation, when it passed into law PHL §§2180-2182.

139. The legislature had more than ample opportunity to pass a law on forced quarantine/isolation with failed Assembly bill A416, but it chose not to. (See discussion *supra,* and *see also* Petitioners' Memorandum of Law for greater detail discussion).

140. Accordingly, Respondents' promulgation of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* directly contravenes the legislature's intent of PHL §§2180 - 2182.

141. If state agencies (ie. unelected, appointed bureaucrats that are part of the Executive Branch of government) are permitted to make regulations in contradiction of valid, existing laws as passed by the people's duly elected representatives in the legislature, then this will result in the abolition of the legislature as a co-equal branch of government.

## Respondents' Promulgation Of 10 NYCRR §2.13 Was Arbitrary And Capricious When Respondents Replaced The Original Sections Pertaining To Existing Isolation And Quarantine Procedures With 10 NYCRR §2.13

142. Prior to the promulgation of 10 NYCRR §2.13 in 2020 by Governor Cuomo's administration (and subsequently in 2021 by Respondents), there were regulations that spoke to isolation and quarantine that were housed in 10 NYCRR §§2.25 – 2.30.

143. These prior regulations, which were repealed in the beginning of 2020, did not contradict or violate the provisions of existing laws PHL §2120, §2100, PHL §12, §§2180-2182 and SAPA.

144. Respondents DOH and Council repealed 10 NYCRR §§2.25 – 2.30 and then Respondents promulgated 10 NYCRR §2.13 which expands Respondent Commissioner

Bassett's powers, and directly violates existing law PHL §2120, §2100, PHL §12, §§2180-2182 (as discussed *supra*).

145. Respondents moved the entire topic of quarantine rules and procedures from the section entitled "ISOLATION, QUARANTINE AND RESTRICTIONS" (ie. where the [now repealed] sections §§2.25-2.30 lived,[10] and they moved that topic into the section entitled "REPORTING OF CASES; RECORDS" (ie. 10 NYCRR §2.13).[11]

146. The repealed subparts §§2.25-2.30 had been in place for decades until Respondents repealed them in 2020. (See Exhibit DD for the 2019 versions of 10 NYCRR §§2.25-2.30).

147. Here are the titles to give an idea of the scope of what was repealed:

> 2.25 *Contacts, date of last exposure, isolation and quarantine defined*
> 2.27 *Physician to isolate person with highly communicable disease and give instructions regarding prevention of spread of the disease*
> 2.28 *Persons suffering from certain communicable diseases to be isolated*
> 2.29 *Other highly communicable diseases*
> 2.30 *Diptheria*

148. In repealing these sections and issuing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents expanded their powers.

149. Before it was repealed, 10 NYCRR §2.25(e) was entitled "*Quarantine of premises*", and it laid out the prohibition to enter a quarantined location or remove certain items therefrom. Quarantine was of a **location**, not of **people** as it now is pursuant to 10 NYCRR §2.13.

150. Before it was repealed, 10 NYCRR §2.27 was entitled "Physician to isolate person with highly communicable disease and give instructions regarding prevention of spread of the disease", and it required a physician to isolate a patient that had a highly communicable disease. So, they were to isolate them IF they actually had the disease. Now, pursuant to 10 NYCRR §2.13(g)(1), a physician must not only isolate a person who has the highly

---

[10] see https://regs.health.ny.gov/volume-title-10/content/isolation-quarantine-and-restrictions)
[11] See https://regs.health.ny.gov/volume-title-10/content/reporting-cases-records

communicable disease, but now they must also isolate someone who is **suspected of having** the highly communicable disease.

151. Furthermore, before it was repealed, 10 NYCRR §2.27 did not have a reporting requirement in its language, yet now 10 NYCRR §2.13(g)(1) requires a physician to report the person to the DOH and the local health authority where the patient is isolated and the local health authority where the patient resides.

152. In repealing 10 NYCRR §2.28 entitled "Persons suffering from certain communicable diseases to be isolated", and 10 NYCRR §2.30 entitled "Diptheria", Respondents got rid of pre-set timeframes for isolation, and now in 10 NYCRR §2.13 there are no set timeframes for isolation/quarantine, as the power to decide the timeframe is arbitrarily left to the Commissioner as she deems fit.

153. In repealing 10 NYCRR §2.29, Respondents deleted the clearly stated fact that local health officials at the city, county or district level, have the power to isolate (not quarantine) such patients (ie. those who are actually ill). Now Respondents provide in 10 NYCRR §2.13 *Isolation and Quarantine Procedures* that the Commissioner can quarantine whomever she wants, whether they are sick or not, which is a direct violation of PHL §2120.

154. Respondents also changed the definitions applicable to this chapter as found in 10 NYCRR §2.2 *Definitions*, in order to expand the scope of their powers.

155. Here are some of the most egregious changes:

    1) 10 NYCRR §2.2(b) previously defined diagnosis of a "case" as being based solely on clinical judgment, laboratory evidence, or on both criteria. Now §2.2(b) says the diagnosis may be based on clinical judgment, signs and symptoms combined with

known exposure based on the best available evidence of transmissibility to a case or suspected case, and/or on laboratory evidence, as applicable.

2) 10 NYCRR §2.2(c) definition of "suspected case" went from someone "diagnosed as likely to have a particular disease" to "as possibly having a particular disease." Respondents also expanded the definition by adding a new provision that assigned new powers to the Commissioner. It reads, "The term 'suspected case' shall include persons under investigation, consistent with any guidance that the Commissioner of Health may issue with respect to a particular case."

3) In 10 NYCRR §2.2, Respondents added (h)-(q) so that the scope of the regulation changes completely with (h)Contact, (i) Isolation, (j) Quarantine (of people, not of a place or an item), (k)Home quarantine or home isolation, (l) Congregate quarantine, (m) Highly contagious communicable disease, (n) Monitor, (o) Mandatory quarantine, (p) Voluntary quarantine, (q) Confinement. (See Exhibit EE).

156. An administrative agency is expected to be consistent when issuing regulations and decisions, and when it's not, it should provide a reason therefor.

157. In a case regarding an agency interpretation of a tax law (and specifically whether income was deemed business income or investment income), the Court of Appeals in *Matter of Howard Johnson Co v. State Tax Comm.*, (65 NY2d 726 [1985]), held that the Petitioner was entitled to rely on the Commissioner's interpretation of the statute since for more than 20 years the Commissioner had consistently interpreted the statute to mean that short-term notes of the kind in issue were investment capital and the income earned from them was investment income. The Court established that, the policy reasons for consistent results when there are similar facts, is to provide guidance for those governed by the determination made. (*Id* at 727). There, the Court held that the Respondent's contrary

interpretation of the statute was arbitrary and capricious.

158. In *Re Charles A. Field Delivery Serv., Inc. v Roberts*, 66 NY.2d 516, 520 (1985), the Court of Appeals went further and held that when an administrative agency "determines to alter its prior stated course it must set forth its reasons for doing so." (*Id* at 520). The Court reasoned that if an explanation is not provided as to why the agency strayed from its normal course, then "a reviewing court will be unable to determine whether the agency has changed its prior interpretation of the law for valid reasons or has simply overlooked or ignored its prior decision." (*Id.*)

159. It is clear that Respondents have changed course, and in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, they have expanded their own powers by completely changing the sum and substance of the former isolation and quarantine rules, and they have done so without any explanation.

160. As such, Respondents' actions are arbitrary and capricious and must be nullified by this honorable Court.

### III. RESPONDENTS PROMULGATION OF 10 NYCRR §2.13 *ISOLATION AND QUARANTINE PROCEDURES* AS AN EMERGENCY REGULATION MAKES IT CAPABLE OF REPETITION, YET EVADING REVIEW

161. The "capable of repetition, yet evading review" doctrine is a long-standing principle in law.

162. It is an exception to the mootness doctrine which. has long been recognized by New York courts and is clearly well settled New York law. (See Matter of M.B., 6 N.Y.3d 437, 447, 813 N.Y.S.2d 349, 846 N.E.2d 794 [2006], citing Matter of Hearst Corp. v. Clyne, 50 N.Y.2d 707 [1980]).

163.

164. There are a couple of exceptions to the mootness doctrine. One exception applies when a case involves circumstances that exist only for a short, fixed time period and that may be over by the time the litigation is fully litigated to its highest court.

165. This circumstance is present in this case, as the 10 NYCRR §2.13 *Isolation and Quarantine Procedures* regulation has been repeatedly readopted by Respondents as an emergency regulation, and it is currently issued as an Emergency Regulation that has an effective date of 2/22/22 – 4/22/22. (See Exhibit A).

166. Petitioner is challenging the repeated emergency adoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, but the challenge will never get fully litigated to the highest court before the 60-day permissible time-frame of an emergency regulation as per SAPA §202(6)(b).

167. The other exception to the mootness doctrine applies when the Respondent voluntarily decides to cease the contested action that is the basis of the lawsuit.

168. This circumstance is also present in this case, as according to the State Register, this 10 NYCRR §2.13 *Isolation and Quarantine Procedures* emergency regulation will remain in the Register for 12 months (until 12/15/22), and the agency can act upon it at any time during that time frame. (See Exhibit FF).

169. But since the re-adoption of an emergency regulation, as per SAPA §202(6)(b), limits the emergency re-adoption to 60 days at a time, the issue would remain in constant evasion of a court's final review.

170. This is the epitome of "capable of repetition, yet evading review", and is the exact type of circumstance that formed the basis of the exceptions to the mootness doctrine.

## Respondents Are Violating SAPA §100

**To The Severe Detriment Of Plaintiffs**

171. SAPA §100 lays out the statute's legislative intent:

> The legislature hereby finds and declares that the administrative rulemaking, adjudicatory and licensing processes among the agencies of state government are inconsistent, lack uniformity and **create misunderstanding by the public**. In order to provide the people with simple, uniform administrative procedures, an administrative procedure act is hereby enacted. This act **guarantees that the actions of administrative agencies conform with sound standards** developed in this state and nation since their founding through constitutional, statutory and case law. It **insures that equitable practices will be provided to meet the public interest**. (Emphasis added).

172. Respondents' continuous readoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* has been anything but "conforming with sound standards."

173. Respondents have strewn nothing but confusion and fear upon New Yorkers regarding this "regulation".

174. Respondents readopted 10 NYCRR §2.13 *Isolation and Quarantine Procedures* on November 24, 2021 as a combination emergency and permanent regulation.  It was published approximately 3 weeks later in the New York State Register as "Emergency/Proposed Rule Making". (See <u>Exhibit GG</u>).

175. This was very confusing to the public, as New Yorkers did not understand if the regulation was being proposed permanently because the title said "Emergency".

176. Furthermore, the NY Register from as recently as March 30, 2022, shows the regulation listed as an emergency and permanent. (See <u>Exhibit HH</u>).

177. The March 9, 2022 New York State Register says the "regulation" notice is an "Emergency Rule Making", but it states therein, "This notice is intended to serve only as a notice of emergency adoption. This agency intends to adopt the provisions of this emergency rule as a permanent rule, having previously submitted to the Department of State a notice of proposed rule making… Issue of December 15, 2021."  However,

Respondents to not clarify when they will adopt the emergency rule as permanent. (See Exhibit II for March 9, 2022 Register).

178. Then the March 16, 2022, the March 23, 2022, and the March 30, 2022 New York State Register entries all have 10 NYCRR §2.13 *Isolation and Quarantine Procedures* indexed as an "emergency" and permanent regulation. (See Exhibit JJ).

179. It is unclear if Respondents will continue their impermissible trend of re-adopting this "regulation" as an emergency (this would be their fourth consecutive time), or if they intend to adopt the "regulation" as permanent once this "emergency regulation" expires on 4/22/22.

180. Regardless, whether issued as an emergency regulation (which is effective now through April 22, 2022), or as a permanent regulation, the argument is the same: Respondents lacked the power to issue 10 NYCRR §2.13 *Isolation and Quarantine Procedures* in any capacity, because it is a law cloaked as a regulation, and agencies are not permitted to make law, as that is the sole function of the legislative branch.

## IV. RESPONDENTS ARE VIOLATING PETITIONERS' SUBSTANTIVE DUE PROCESS RIGHTS. THE GOVERNMENT MUST SHOW A COMPELLING STATE INTEREST WHEN VIOLATING A CITIZEN'S RIGHTS, AND THAT RESTRICTION MUST BE NARROWLY TAILORED TO ACHIEVE THE GOVERNMENT'S GOAL

181. The right of citizens to vote for their elected representatives is the foundation of our constitutional republic.

182. The right to vote ("suffrage"), is so sacred, it is listed second only to our Bill of Rights in our NYS Constitution.[12]

---

[12] https://dos.ny.gov/system/files/documents/2022/01/Constitution-January-1-2022.pdf

183. The right to elect their representatives in the law-making process is of paramount importance to Petitioner Uniting NYS and its members. That right is being abolished by Respondents in their promulgation of 10 NYCRR 2.13 which is a law cloaked as a regulation.

184. Even if Respondents had the power to adopt 10 NYCRR 2.13 (which they do not, but assuming arguendo they do), Petitioners have a fundamental right to freely go about their lives without the fear of, or the actuality of, being forced to isolate themselves or quarantine in a facility designated by the Respondents, for however long Respondents deem appropriate, simply because the Respondents **suspect** that Petitioners **may** have a communicable disease.

185. We are a society of compassion, and we assume our people are innocent until proven guilty, so it is capricious for Respondents to endow the Commissioner with the power to force people to isolate/quarantine without proof that they actually pose a threat to public health (ie. without due process).

186. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is so broad, the power it bestows upon Respondents shocks the conscience. Respondents can literally, whenever they choose, take you from your home, or take your children from their school, etc., with the help of law enforcement, and force you or your loved ones to a location of *their* choice, indefinitely, for however long *they* want, without any actual proof that you or your child pose a threat to the public health.

187. Respondents promulgated 10 NYCRR 2.13(b)(1-12) specifying the details that each of Respondent Commissioner Bassett's orders shall contain. There is no question that they lack reason and are extremely subjective to the whim of Respondent Commissioner:

> (1) basis for the order, (that "basis" could be anything; no scientific proof is required).

(2) the location where the person is being forced to go/stay, (that location could be anywhere).

(3) how long they will forcibly be held/isolated, (that time-frame could be any number of days, weeks, months or years?).

(4) instructions on how to get to the quarantine facility location, (that could be down the road, a 5 hour plane ride, or a 36 hour train ride away?).

(5) what other required actions the person must take while being forcibly held/isolated, subject to the Commissioner of Health's direction, (that could mean literally anything the Commissioner wants the captive to do – perhaps wear 15 masks and change each one every hour in a staggered fashion; wear a hazmat suit 24/7 with an oxygen tank strapped to your back...?).

(6) requirement to report to Respondents or local health authority their health status subject to the Commissioner of Health's direction, (that could mean anything from having to take a test every hour on the hour and send it to Respondents, to having to wear an electronic monitor on you at all times to regulate your vitals, to...?).

(7) requirement that they stay inside if they are quarantined/isolated in a multi-family dwelling, subject to the Commissioner of Health's direction, (that could mean staying inside for days, weeks, months, years on end if Respondents so choose?).

(8) requirement that they cannot come within 6 feet of another human being while forcibly held, subject to the Commissioner of Health's direction, (that could mean if you are forcibly quarantined with family or friends that you cannot hug or kiss or comfort them, or cook a meal together, or eat together...?).

(9) requirement that they must abide by any such other limitations on their interactions with other people as Respondent Commissioner deems appropriate, (that could literally mean anything whatsoever. Anything at all that the Respondent feels is proper).

(10) notice that the person being held in a facility can request that the government inform their family they are being forcibly held, (that means you can *request*, not demand, that they tell your family, friends, your boss etc. that you are being forcibly held... but they need not actually tell them if they don't want to).

188. This notion that one person can control the every move of potentially 19 million New Yorkers flies in the face of logic, let alone legal principles upon which our State and our Nation are founded.

189. Respondents are applying a blanket policy to everyone regardless of age, medical history, vulnerability, and other factors specified by the CDC regarding COVID19 issues and survival rates. This is the antithesis of a narrowly tailored restriction to achieve a compelling government interest.

190. Respondents have not considered less draconian or other more reasonable alternatives.

191. Respondents are acting as if it is March 2020, where the virus was new, unknown, and it seemed back then that the likelihood of death or severe illness perhaps warranted an extreme response.

192. Today we have various treatments for COVID19 and the survival rate according to the CDC is between 99.997% - 94.6% depending on age and such.[13]

193. According to the CDC, the metrics of importance are no longer the spreading of the virus, but hospitalization and mortality rates. (*See* discussion *supra* and in detail in Petitioners' Memorandum of Law).

194. In promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents have ignored the last two years of progress and are readopting an overly broad and restrictive scheme that was promulgated at the onset of the pandemic pursuant to *temporary, emergency* powers that were bestowed upon a prior Governor and his administration.

195. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is not rationally related to a compelling state interest.

## V. RESPONDENTS PROMULGATED 10 NYCRR §2.13 *ISOLATION AND QUARANTINE PROCEDURES* WITHOUT A RATIONAL BASIS AND IT IS ARBITRARY AND CAPRICIOUS

196. Respondents cannot justify issuing regulations that precisely mirror a proposed legislation (ie. failed Assembly bill A416) that was so repugnant to a free society that it just sat in the legislature for several years without garnering any support at all, other than

---

[13] https://data.cdc.gov/NCHS/Provisional-COVID-19-Deaths-by-Sex-and-Age/9bhg-hcku

that of the bill's author, Assemblyman Nick Perry (D-Brooklyn).

197. There was no actual State disaster emergency that would justify the promulgation of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* as an emergency regulation. Respondents took that route because it was easier and it can afford them the possibility of evading review.

198. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* places the decision-making power into the hands of one person to decide the fate of 19 million New Yorkers as far as who can live their life freely and who can be pulled from the privacy of their home, workplace, school, etc. without notice and removed from society for an arbitrary and indefinite amount of time, in a location they are not allowed to choose, and that they are not allowed to leave until Respondents allow them to.

199. The scope of the power that Respondents have bestowed upon themselves with 10 NYCRR §2.13 is unbelievable.

200. Respondents have no rational basis for adopting this "regulation". The "Need and Benefits" section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* provides no true justification and references only the general history of COVID19, how it caused the politicians to declare a public health emergency in the United States since January 27, 2020, and that last fall there was a new Omicron variant identified. (See <u>Exhibit A</u>).

201. The Omicron variant is weaker than the Delta variant before it, which was weaker than the original variant before that, according to CDC data.[14]

202. Respondents cite no specifics to New York State that would justify an emergency promulgation of 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

203. Respondents do not cite any study at all (not even one) that proves that quarantining

---

[14] https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e4.htm?s_cid=mm7104e4_w

(particularly forced quarantining) of people suspected of having COVID19 actually stops the spread of the virus, or that when balancing the equities, that this quarantining does more good than harm.

204. Yet there are hundreds of studies that show that forcibly quarantining people has caused disastrous results with increased depression, suicide, loss of income, loss of livelihood, violence, and so on.[15]

205. Respondents rely on nothing that could be considered a valid, rational basis, when they anoint themselves with the power to enact 10 NYCRR §2.13 *Isolation and Quarantine Procedures* and bestow new powers on themselves.

206. The "Needs and Benefits" section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* says:

> In light of this situation, these regulations **update, clarify and strengthen the Department's authority** as well as that of local health departments to take specific actions to control the spread of disease, including actions related to investigation and response to a disease outbreak, as well as the issuance of isolation and quarantine orders. (Emphasis added). (See Exhibit A).

207. Respondents are not permitted to "strengthen" their own authority.

208. Strengthening one's own authority is the very definition of tyranny.

209. There is no anchor statute that gives Respondents the authority to expand their powers.

210. No part of PHL §225 (the supposed anchor statute for 10 NYCRR §2.13 *Isolation and Quarantine Procedures*) empowers Respondents to promulgate isolation and quarantine procedures.

211. Moreover, in the "Needs and Benefit" section of 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents admit that "People infected with COVID19 have

---

[15] See, *More Than 400 Studies on the Failure of Compulsory Covid Interventions (Lockdowns, Restrictions, Closures)* By Paul Elias Alexander, November 30, 2021
https://brownstone.org/articles/more-than-400-studies-on-the-failure-of-compulsory-covid-interventions/

had symptoms ranging from those that are mild (*like a common cold*) to severe..."
(emphasis added). (See Exhibit A).

212. So pursuant to 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents
can force someone who may have *cold symptoms*, into quarantine or isolation for merely
having symptoms that could maybe be consistent with (possibly) COVID19.

213. Furthermore, in the "Needs and Benefit" section of 10 NYCRR §2.13 *Isolation and
Quarantine Procedures*, Respondents admit that COVID19 poses "a disproportionate risk
of severe illness for older adults and/or those who have serious underlying medical health
conditions." (See Exhibit A).

214. So pursuant to this language in 10 NYCRR §2.13 *Isolation and Quarantine Procedures*,
Respondents can force a child to quarantine, separated from their parents at a location of
Respondents' choice, for however long Respondents want, if Respondent Commissioner
thinks it's appropriate even though children are disproportionately *unaffected* by the virus.

215. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is harsh, anti-science, and
nonsensical as it unilaterally gives the Respondents the power to lockdown or lockup New
Yorkers for possibly no reason, and then fine them or press criminal charges against them
if they do not comply.

216. Furthermore, prior to the promulgation of 10 NYCRR §2.13 *Isolation and Quarantine
Procedures* in 2020 and subsequently in 2021 and 2022, there were regulations that spoke
to isolation and quarantine that were housed in 10 NYCRR §§2.25 – 2.30. (See Exhibit
DD)

217. These prior regulations which were repealed in the beginning of 2020, did not contradict
or violate the provisions of existing laws PHL §2120, §2100, PHL §12, §§2180-2182 and
SAPA. (See detailed discussion in Petitioner's Memorandum of Law).

218. Respondents DOH and Council repealed 10 NYCRR §§2.25 – 2.30 and then Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* which directly violates existing New York State law PHL §2120, §2100, PHL §12, PHL §§2180-2182 and SAPA (as discussed *supra* and in Petitioners' Memorandum of Law).

219. The lack of rational basis, together with the lack of statutory authority upon which to formulate 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, together with its unbelievably broad breath of power for Respondents to rip New Yorkers from their daily lives and subject them to civil and criminal penalties for noncompliance, shocks the conscience and clearly is arbitrary and capricious.

## VI. RESPONDENTS' ILLEGAL AND UNCONSTITUTIONAL ACTIONS HAVE INJURED PETITIONERS AND ALL THOSE SIMILARLY SITUATED, AND WILL CONTINUE TO CAUSE HARM

220. Respondents have exceeded the scope of their authority, have abused their regulatory making power, and as such have impermissibly crossed into the realm of law-making to the detriment of Petitioners Legislators Senator Borrello, Assemblyman Tague and Assemblyman Lawler, and all those legislators similarly situated.

221. Petitioners Legislators Senator Borrello, Assemblyman Tague and Assemblyman Lawler are having their power usurped by Respondents, whether intentional or not, the result is the same injury to these Petitioners and all those New York State legislators similarly situated.

222. Petitioners Legislators Senator Borrello, Assemblyman Tague and Assemblyman Lawler's right to vote on a law before it takes effect is being violated by Respondents.

223. Article III §13 of the New York State Constitution sets for the enacting clause for all laws. It reads, "The enacting clause of all bills shall be 'The People of the State of New

York, represented in Senate and Assembly, do enact as follows,' **and no law shall be enacted except by bill.**" (emphasis added).

224. Petitioners Legislators Senator Borrello, Assemblyman Tague and Assemblyman Lawler are being irreparably harmed by Respondents who have usurped Petitioner Legislators' power to make law, and as such, these Petitioners are being prevented from carrying out their duties of representing the voice of their constituents in such law-making matters.

225. Petitioner Uniting NYS and its members are being irreparably harmed by Respondents in that they are being robbed of their right to have their voices heard in the legislature before a bill becomes a law.

226. . Article III §13 of the New York State Constitution's enacting clause provides that the people shall have a representative form of government. It requires that all laws begin with the words, "**The People of the State of New York**, represented in Senate and Assembly, do enact as follows," (emphasis added).[16]

227. By impermissibly making law (ie. 10 NYCRR §2.13 *Isolation and Quarantine Procedures*), Respondents are usurping Petitioner Uniting NYS' (and all others similarly situated) right to be heard through their representatives in the legislature.

228. The Constitution is there to keep the government in check... not the people.

229. Petitioners are having their voices silenced by Respondents on this matter of forced isolation and quarantines.

230. When the voices of the people, through their elected representatives in the legislature,

---

[16] John Randolph, supporting James Madison's version of the Constitution, said that a republican government must be the basis of our national union; and no state in it ought to have it in their power to change its government into a monarchy. *1 The Records of the Federal Convention of 1787, at 206 (Max Farrand ed., 1937)*. Following speakers alluded to the dangers of monarchy being created peacefully as necessitating the provision. *Id.* at 48. *See* W. Wiecek, The Guarantee Clause of the U.S. Constitution ch. 2 (1972).

go unheard because the executive branch makes laws that are then forced upon the people... that is tyranny.

## If 10 NYCRR §2.13 *Isolation and Quarantine Procedures* Is Not Struck Down, It Will Lead To The Subordination Of The Legislative Branch Of Government

231.  The foundation of our government is that we have "three coordinate and coequal branches of government, each charged with performing particular functions.   This principle... requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies." (See *Garcia v. New York City Dept of Health & Mental Hygiene,* 31 NY3d 601, __ [2018]).

232.  "Manifestly, it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends." See *Boreali v. Axelrod*, 71 NY2d 1, 13 [1987].

233.  The legislature had the opportunity for the past six years, including during the past two years which were the height of the pandemic, to enact legislation (A416) that was the same sum and substance of 10 NYCRR §2.13, but it refused to enact A416.

234.  Respondents promulgated 10 NYCRR §2.13, which is effectively the same as A416.

235.  If this honorable Court allows 10 NYCRR §2.13 to stand, then the precedent is set for the executive branch to make law – whenever they cannot get the legislature to pass a desired law, then they will simply make a regulation of the same sum and substance and push it through the agency of choice.

236.  The legislative branch will lose its standing as a coequal branch of government, and it will exist in name only, as a relic of what once was. (See *Matter of Gen. Elec. Capital Corp. v New York State Div. of Tax Appeals,* 2NY3d 2149, 254 [2004]) (holding that an

administrative agency as an arm of the executive branch does not have unbridled power in exercise of its rule making authority).

237. The injury to all of the Petitioners and all those similarly situated almost cannot be measured as 10 NYCRR 2.13 is such a gross violation of Separation of Powers, it is the very sort of thing that separation of powers is designed to prevent.

## VII. PETITIONERS' REQUEST FOR INJUNCTIVE RELIEF SHOULD BE GRANTED

238. On a motion for a preliminary injunction, the movant must prove three things in order to succeed: (1) likelihood of ultimate success on the merits; (2) irreparable injury absent granting of the injunction; and (3) a balancing of the equities in petitioner's favor. (*Albini v. Solork Associates*, 37 A.D.2d 835 (1971) citing *Park Terrace Caterers v. McDonough*, 9 A.D.2d 113 (1959); *Barricini, Inc. v. Barricini Shoes,* 1 A.D.2d 905 (1956); *Gilbert v. Burnside*, 6 A.D.2d 834 (1958)).

239. The moving party need only show a likelihood of success on the merits, and not a certainty of success. (See *Rosemont Enterprises v. McGraw-Hill Book Co.*, 85 Misc. 2d 583, 585 [1975]).

### Likelihood of Success on the Merits

240. Petitioners have made a strong showing of likelihood of success on the merits, as their claims are founded in solid, long-standing legal doctrine and law.

241. In promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents violated the New York State Constitution, the separation of powers doctrine blatantly and without question, by making a law cloaked as a regulation, whereby usurping the power of the legislature which extinguishes not only the voice of the legislators, but the voices of the people.

242. PHL §225 (the supposed anchor statute for 10 NYCRR 2.13) does not authorize the promulgation of 10 NYCRR §2.13.

243. In promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, Respondents have also violated State laws (PHL §2120, §2100, §12 and §§2080-2082), and they violated SAPA requisite procedures.

244. Respondents' 10 NYCRR §2.13 *Isolation and Quarantine Procedures* truly shocks the conscience. The breadth of power it bestows upon Respondents is unbelievable, as it empowers them to control the lives of over 19 million New Yorkers with the flick of their pen and at their whim. This is the antithesis of a "representative form of government".

245. Everyone is injured when the rule of law is cast aside, and tyranny is allowed to take hold.

### Irreparable Injury to Petitioners

246. The injury to Petitioners Legislators Senator Borrello, Assemblyman Tague, Assemblyman Lawler, and all those legislators similarly situated, is indisputable. Respondents are taking a power that is specifically reserved for Petitioners Legislators Senator Borrello, Assemblyman Tague, and Assemblyman Lawler, and if Respondents' 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is allowed to stand, then Petitioners Legislators will continuously be harmed.

247. Conversely, if 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is permanently or temporarily enjoined, Respondents cannot show that they would be harmed in any way.

248. The injury to Petitioner Uniting NYS and its members, and all those similarly situated, almost cannot be measured, as their right to be heard in important policy decisions that directly and gravely affect their lives, is undeniable.

249. By usurping the power of the legislature, Respondents are directly injuring Petitioner Uniting NYS and its members by silencing their voices on this urgent and controversial

topic of forced isolation and quarantines.

250. Moreover, the injury to Petitioner Uniting NYS and its members, and all those similarly situated, in their loss of liberty, loss of freedom, loss of autonomy, loss of wages, loss of family, etc, is also immeasurable if Respondents are permitted to continue to adopt and enforce 10 NYCRR §2.13 *Isolation and Quarantine Procedures.*

251. Conversely, the injury to Respondents if the injunction is granted temporarily and/or permanently is negligible to zero, as Respondents point to no studies that prove that forced quarantining of citizens is an effective tool, and the least restrictive way to achieve a state interest.

252. In fact, there are hundreds of studies that show that forced quarantines cause so much psychological, emotional, and physical harm in the way of depression, anxiety, fear, stress, delayed medical exams, loss of jobs, loss of income, loss of businesses, etc., that the harm far outweighs any possible benefit that might be derived from such forced isolation.[17]

253. In *Tucker v. Toia*, (54 AD 2d 322 (1976]), Petitioners were about to have their home relief benefits terminated as a result of a proposed implementation of an amendment to a statute. There, the 4th Department held that the Petitioners' argument was based on substantial principles of constitutional law and involved novel issues of first impression, such that it was "precisely the situation in which a preliminary injunction should be granted to hold the parties in status quo while the legal issues are determined in a deliberate and judicious manner." (*Id* at 323).

254. The same applies here, where Petitioner's argument is based on substantial principles of constitutional law and it involves novel issues of first impression.

---

[17] See, *More Than 400 Studies on the Failure of Compulsory Covid Interventions (Lockdowns, Restrictions, Closures)* By Paul Elias Alexander, November 30, 2021
https://brownstone.org/articles/more-than-400-studies-on-the-failure-of-compulsory-covid-interventions/

## Balancing of the Equities Favors Petitioners

255. The balancing of the equities favors Petitioners because Respondents have knowingly and purposely circumvented the legislature in order to make a law that was so repugnant to the legislators that, for several years, the legislature refused to pass it, time and again (ie. Assemblyman Nick Perry's bill A416).

256. In order to get equity, one must do equity; Respondents, who are Executive Branch members, cannot illegally make a law and then plead that it is unfair for this honorable Court to grant and injunction to stop their wrongdoing.

257. Unelected agency administrators are not supposed to make policy decisions that will have potentially catastrophic effects on citizens.

258. Policy decisions are left for our elected officials in the State Senate and Assembly to openly debate and discuss, with input from the people, such that their voices can be heard on such a serious and potentially harmful topic.

259. The balancing of the equities further weighs in Petitioner's favor, as Respondents have continuously adopted 10 NYCRR §2.13 as an emergency, and adjudication on the issue is possible of repetition, yet evading review.

## AS AND FOR THE FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT THAT RESPONDENTS PROMULGATED 10 NYCRR 2.13 IN VIOLATION OF THE NEW YORK STATE CONSTITUTION

260. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

261. The New York State Constitution is clear: Article V §III, Article III §1 and Article IV §1 establish the separation of powers in our State government, and only the legislature can make law, and only the legislature can assign new powers to executive branch agents.

262. The legislature did not assign any of the Respondents with new power.

263. Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* in direct violation of the New York State Constitution.

264. As a result, Petitioners are being harmed by Respondents, as discussed in detail *supra*.

## AS AND FOR THE SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT THAT RESPONDENTS LACK THE STATUTORY AUTHORITY TO PROMULGATE 10 NYCRR 2.13

265. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

266. Respondents rely upon Public Health Law §225 to issue 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, but PHL §225 does not grant Respondents any such authority.

267. In promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures,* Respondents have exceeded the scope of their authority.

268. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra*.

## AS AND FOR THE THIRD CAUSE OF ACTION DECLARATORY JUDGMENT THAT RESPONDENTS VIOLATED PETITIONERS' SUBSTANTIVE DUE PROCESS AND OTHER CONSTITUTIONAL RIGHTS UNDER NEW YORK STATE LAW IN PROMULGATING 10 NYCRR § 2.13

269. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

270. Pursuant to the NYS Constitution, including but not limited to Article II, Article III, and Article I §9, Petitioner Uniting NYS members, and all those similarly situated, have a fundamental right to vote for their elected representatives so that their voices can be heard in the policy and law-making process that takes place in the State legislature.

271. Pursuant to the NYS Constitution, including but not limited to Article I §12, §6 and §4, Petitioner Uniting NYS members, and all those similarly situated also have a fundamental right to freely go about their lives without being what equates to arrested and forced to isolate themselves in a facility or other facility designated by the Respondents, for however long Respondents deem appropriate, simply because the Respondents **suspect** that Petitioners **may** have a communicable disease.

272. Pursuant to the NYS Constitution, including but not limited to Article II and Article III, Petitioner Legislators Borrello, Tague and Lawler have the right to represent those citizens who have elected them to office in the New York State legislature, and they have the right to vote on a law before it goes into effect.

273. Respondents did not have the power to promulgate 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, and even if they had, they did not tailor their government interest as narrowly as possible, nor did they provide for alternatives.

274. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra*.

## AS AND FOR THE FOURTH CAUSE OF ACTION: DECLARATORY JUDGMENT THAT IN PROMULGATING 10 NYCRR 2.13 RESPONDENTS DID NOT HAVE A REASONABLE BASIS AND THUS ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER

275. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

276. Respondents cannot justify adopting 10 NYCRR 2.13 which is the same sum and substance of bill A416 which was so repugnant to the legislators that they refused to act on it, for years, including during the height of mass hysteria and fear that the COVID19 pandemic evoked.

277. The "Needs and Benefit" section of 10 NYCRR § 2.13 establishes no true need, as not one study is cited by Respondents. This in combination with the fact that Respondents gave themselves the power to force someone into isolation or into a quarantine facility resulting in the loss of freedom, liberty, and pursuit of one's livelihood, for having something as benign as "cold-like symptoms" is unconscionable.

278. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra*.

## AS AND FOR THE FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT THAT 10 NYCRR §2.13 VIOLATES EXISTING NEW YORK STATE LAW AND IS THEREFORE IMPERMISSIBLE, ARBITRARY AND CAPRICIOUS

279. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

280. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* violates existing State statutes, namely Public Health Law ("PHL") §2100 Titled "Communicable diseases; local boards of health and health officers; powers and duties", PHL §2120 Titled "Communicable diseases; control of dangerous and careless patients; commitment", PHL §12 Titled "Violations of health laws or regulations; penalties and injunctions", PHL §§2180-2182 Titled "Novel Coronavirus, Covid-19", and it is thus impermissible, and null and void.

281. If state agencies (as a part of the Executive Branch of government) are permitted to make regulations in contradiction of valid, existing laws as passed by the legislature, then this would result in the abolition of the legislature as a co-equal branch of government.

282. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra*.

## AS AND FOR THE SIXTH CAUSE OF ACTION:

## DECLARATORY JUDGMENT THAT RESPONDENTS VIOLATED SAPA WHEN THEY ADOPTED 10 NYCRR §2.13 AND IT IS THEREFORE IMPERMISSIBLE, ARBITRARY AND CAPRICIOUS

283. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

284. SAPA was created by the legislature to ensure that when an agency promulgates a rule or regulation, it adheres to equitable practices so as to meet the public interest in have uniform procedures that the public can understand and rely upon.

285. Respondents were supposed to comply with SAPA in promulgating 10 NYCRR §2.13 *Isolation and Quarantine Procedures.*

286. Respondents failed to comply with SAPA in any substantive manner.

287. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra.*

## AS AND FOR THE SEVENTH CAUSE OF ACTION: DECLARATORY JUDGMENT THAT RESPONDENTS VIOLATED THE WILL OF THE LEGISLATURE WHEN THEY ADOPTED 10 NYCRR §2.13 AND IT IS THEREFORE IMPERMISSIBLE, ARBITRARY AND CAPRICIOUS

288. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

289. The legislature had ample opportunities to pass a law that would force citizens to quarantine or isolate, but the legislature refused to act.

290. Assembly bill A416 sat for years, unsupported by anyone other than the bill's author. Neither the legislators in the Assembly nor in the Senate were interested in acting on the topic.

291. The only COVID19 legislation the legislature passed that has anything to do at all with containing the disease is a statute that allows for contact tracing **only**. (ie. PHL §§2180-2182).

292. Furthermore, on February 8, 2022, dozens of New York State Assembly members penned a letter to Respondents Hochul and Bassett urging them and Respondent DOH to

stop the adoption of 10 NYCRR §2.13 *Isolation and Quarantine Procedures* "regulation", as they believe it is unconstitutional and a clear breach of separation of powers.

293. As a result, Petitioners are being harmed by Respondents as discussed in detail *supra*.

## AS AND FOR THE EIGHTH CAUSE OF ACTION: ISSUANCE OF A PRELIMINARY AND PERMENENT INJUNCTION AGAINST FURTHER ADOPTION OF AND/OR ENFORCEMENT OF 10 NYCRR 2.13

294. Petitioners repeat and reallege each and every allegation above with the same force and effect as though fully set forth herein.

295. Petitioners have no adequate remedy at law, and injunctive relief is appropriate here.

296. Injunctive relief should be granted when a petitioner has shown a (1) likelihood of success on the merits; (2) irreparable injury absent granting of the injunction; and (3) a balancing of the equities in petitioner's favor.

297. Based upon the above, the attached Exhibits, the Affidavits, and Petitioners' Memorandum of Law, injunctive relief should be granted in this matter.

298. 10 NYCRR §2.13 *Isolation and Quarantine Procedures* has the full force and effect of law, but Respondents do not have the power or authority to make law. Thus, 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is null and void as it was improperly enacted, constitutionally impermissible, violates the Separation of Powers doctrine, is preempted by existing New York State Law, and is unenforceable.

**WHEREFORE**, Petitioners request the following relief:

1. Declaratory judgment that Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, in violation of the NYS Constitution, and is thus unconstitutional, ultra vires, and null and void.

2.  Declaratory judgment that Respondents lack statutory authority to promulgate 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, and it is thus unconstitutional, ultra vires, and null and void.

3.  Declaratory judgment that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* violates Petitioners' substantive due process rights under the NYS Constitution, and it is thus unconstitutional, ultra vires, and null and void.

4.  Declaratory judgment that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is not the least restrictive way in which Respondents could try to achieve their goal, and thus lacks a rational basis and is arbitrary and capricious.

5.  Declaratory judgment that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* violates existing New York State law, namely Public Health Law ("PHL") §2100 Titled "Communicable diseases; local boards of health and health officers; powers and duties", PHL §2120 Titled "Communicable diseases; control of dangerous and careless patients; commitment", PHL §12 Titled "Violations of health laws or regulations; penalties and injunctions", PHL §§2180-2182 Titled "Novel Coronavirus, Covid-19", and it is thus impermissible, and null and void.

6.  Declaratory judgment that Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* in violation of the NYS Administrative Procedure Act ("SAPA").

7.  Declaratory judgment that Respondents promulgated 10 NYCRR §2.13 *Isolation and Quarantine Procedures* against the will of the NYS Legislature which refused to act on the topic.

8.  Declaratory judgment that 10 NYCRR §2.13 *Isolation and Quarantine Procedures* is invalid, void and unenforceable.

9.  A Preliminary and Permanent Injunction enjoining Respondents from implementing and enforcing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, the basis for which is that 10 NYCRR §2.13 is causing immediate and irreparable harm to Petitioners and all those similarly situated.

10. A Preliminary and Permanent Injunction enjoining Respondents from implementing and enforcing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, the basis for which is that 10 NYCRR §2.13 is capable of repetition yet evading review.

11. A Preliminary and Permanent Injunction enjoining Respondents from implementing and enforcing 10 NYCRR §2.13 *Isolation and Quarantine Procedures*, the basis for which is that 10 NYCRR §2.13 is unconstitutional, void *ab initio*, and therefor unenforceable.

12. A judgment annulling 10 NYCRR §2.13 *Isolation and Quarantine Procedures*.

DATED:  April 19, 2022
           Bronxville, NY

                         Respectfully submitted,

                         Roberta (Bobbie) A. Flower Cox, Esq.
                         Cox Lawyers, PLLC
                         34 Palmer Avenue
                         Bronxville, New York 10708
                         Telephone: 914-779-7762
                         Email: Bcox@CoxLawyers.com

Thomas Marcelle (Bar Roll No. 2245702)
Co-Counsel for Petitioners
61 Devonshire Drive
Slingerlands, NY 12159
Attorney Email: tmarcelle88@gmail.com
Phone: (518) 424-9275

# **VERIFICATION**

STATE OF NEW YORK     )
                           ) ss:
COUNTY OF <u>CHAUTAUQUA</u>  )

      GEORGE M. BORRELLO, being duly sworn, deposes and states that your Deponent is a New York State Senator, is a Petitioner in this proceeding, and that your Deponent has read the foregoing Third Amended Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.

                                                       _____
                                                 GEORGE M. BORRELLO

Sworn to before me this
<u>19th</u> day of April, 2022

_____
Notary Public

Bobbie Anne Flower Cox
Notary Public, State of New York
No. 02FL6032740
Qualified in Westchester County
Commission Expires May 27, 20
8/15/23

## **VERIFICATION**

State of New York )

) ss:

County of _Schoharie_ )

CHRISTOPHER W. TAGUE, being duly sworn, deposes and states that your Deponent is a New York State Assemblyman, is a Petitioner in this proceeding, and that your Deponent has read the foregoing Third Amended Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.

CHRISTOPHER W. TAGUE

Sworn to before me this

_19ᵗʰ_ day of April, 2022

Notary Public

Bobbie Anne Flower Cox
Notary Public, State of New York
No. 02FL6092740
Qualified in Westchester County
Commission Expires May 27, 23

8|15|23

## **VERIFICATION**

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF ROCKLAND         )

MICHAEL LAWLER, being duly sworn, deposes and states that your Deponent is a New York State Assembly Member, is a Petitioner in this proceeding, and that your Deponent has read the foregoing Third Amended Verified Petition and knows of the contents thereof, and that the same are true as of your Deponent's knowledge, except to matters therein stated to be alleged upon information and belief, and as to those matters, that your Deponent believes them to be true.

MICHAEL LAWLER

Sworn to before me this

19th day of April, 2022

Notary Public

Bobbie Anne Flower Cox
Notary Public, State of New York
No. 02FL6092740
Qualified in Westchester County
Commission Expires May 27, 20
8/15/23

## **VERIFICATION**

STATE OF NEW YORK          )
                                              ) ss:
COUNTY OF WESTCHESTER   )

NICOLE VIOLA, being duly sworn, deposes and states that your Deponent

is a Managing Member of UNITING NYS, LLC, a Petitioner in this proceeding,

and that your Deponent has read the foregoing Third Amended Verified Petition

and knows of the contents thereof, and that the same are true as of your Deponent's

knowledge, except to matters therein stated to be alleged upon information and

belief, and as to those matters, that your Deponent believes them to be true.

Deponent has made this Verification on behalf of Petitioner, as Deponent has been

duly authorized to execute this Verification.

NICOLE VIOLA

Sworn to before me this
19th day of April, 2022

Notary Public

Bobbie Anne Flower Cox
Notary Public, State of New York
No. 02FL6032740
Qualified in Westchester County
Commission Expires May 27, 23
8|15|23